NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CBRE, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE CHAD SCHOOL FOUNDATION, INC., <br><br> Defendant. | Civil Action No. 20-cv-9024 <br><br> **OPINION** |

**CECCHI, District Judge.**

This matter comes before the Court on Plaintiff CBRE, Inc.'s ("Plaintiff" or "CBRE") motion for summary judgment. ECF No. 46 ("MSJ"). Defendant The Chad School Foundation, Inc. ("Defendant" or "Chad") opposed the motion (ECF No. 49, "Opp.") and Plaintiff replied (ECF No. 52, "Reply"). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons set forth below, Plaintiff's motion is granted as to liability.

**I.     BACKGROUND**

This dispute arises from the breakdown of a contractual relationship between CBRE, a licensed real estate broker, and Chad, a not-for-profit corporation and owner of a building located at 308 South 9th Street, Newark, New Jersey 07103 (the "Subject Building"). ECF No. 1 at 6–9; ECF No. 46–3 (Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1(b), "PSMF") at ¶ 2. On or about October 6, 2017, Plaintiff and Defendant entered into an exclusive brokerage commissions agreement. MSJ at Ex. 14, CBRE_000080–84 (the "Commission Agreement") at ¶ 2.

1

**The Commission Agreement between CBRE and Chad**

Under the Commission Agreement, Defendant is obligated to pay commissions to Plaintiff in exchange for Plaintiff's exclusive brokerage services, i.e., securing a tenant to execute a lease for the Subject Building. MSJ at 1; PSMF at ¶ 7; Commission Agreement at ¶ 2 ("[Chad grants] to [CBRE], during the term of this agreement, the exclusive right to lease or sell any or all of the above-referenced Premises."). While CBRE would provide Chad with analysis and comparison of lease offers, the Commission Agreement provides that "all final business and legal decisions shall be made solely by [Chad]; and all binding agreements shall be executed and delivered solely by [Chad]." Commission Agreement at ¶ 5.

The Commission Agreement states that CBRE's commission would be 4% on all lease transactions, including all renewals or extensions. *Id.* at Schedule A, ¶ 1. In the initial Commission Agreement, the parties agreed on the following payment schedule:

> 7. [Y]ou shall pay us one (1) full commission in accordance with the attached Schedule A of rates and conditions (the terms of which are incorporated herein)… Such commission(s) shall be paid one-half (1/2) *upon full execution and unconditional delivery of the binding transactional document*s, and one-half (1/2) upon the earlier of (x) occupancy or (y) rent commencement thereunder.

Commission Agreement at ¶ 7 (emphasis added).

Schedule A to the Commission Agreement contains specific carveouts for payments on leases with options to renew or extend. *Id.* at Schedule A, ¶ 3. If a lease contains a renewal or extension option, CBRE "shall be paid a Commission therefor by the Landlord, upon commencement of the renewal or extension period . . . calculated by applying the Lease Commission Rate [4%] to the Rent payable during such renewal or extension period." *Id.* at Schedule A, ¶ 3.

The Commission Agreement also contains an acceleration clause which requires that "[a]ll unpaid installments of a Commission, if any, shall automatically be accelerated if payment of any

installment is not made when due." *Id.* Should the acceleration clause be invoked, the Commission Agreement prescribes that the accelerated unpaid balance shall bear interest and that CBRE shall be entitled to all collection costs it incurs, including reasonable attorneys' fees and disbursements. *Id.*

**Amendment to the Commission Agreement**

On September 14, 2018, Chad (through their Executive Director and Corporate Representative, Eric Stevenson) proposed an amendment to the Commission Agreement. MSJ at Ex. 14, CBRE_000128; PSMF at ¶ 9. Chad proposed that payments be made to CBRE in four installments – 25% upon "contract execution" and 25% at six-month intervals until paid in full. *Id.* As Mr. Stevenson indicated, "[t]his breakdown allows Chad to pay CBRE in full in 18 months." *Id.* Conor Dolan, CBRE's Corporate Representative and lead broker on this transaction, agreed to this payment schedule and forwarded the terms to CBRE's counsel to draft an amendment to the Commission Agreement. MSJ at Ex. 14, CBRE_000127.

On or about September 17, 2018, CBRE and Chad extended and amended the Commission Agreement to alter the proposed payment schedule. PSMF at ¶ 9. Paragraph 7 was amended so that:

> *Commission(s) shall be paid as follows: (a) twenty-five percent (25%) upon full execution and unconditional delivery of the binding transactional documents (the "First Installment"); (b) twenty-five percent (25%) six (6) months following the First Installment; (c) twenty-five percent (25) twelve (12) months following the First Installment; and (d) twenty-five percent (25) eighteen (18) months following the First Installment.*

*Id.*; MSJ at Ex. 14, CBRE-000166 (emphasis added). Notwithstanding the amendment, the balance of the Commission Agreement remained in full force and effect. *Id.*

**The Lease Agreement between Chad and Great Oaks Charter School**

CBRE pursued Great Oaks Charter School ("Great Oaks") as a potential tenant of the Subject Building. PSMF at ¶ 11. As of March 6, 2019, Great Oaks had sent a term sheet to CBRE outlining the projected terms and conditions upon which they would consider leasing the Subject Building. *Id.*; MSJ at Ex. 14, CBRE_000187–97. The proposed term sheet contained a lease term of fifteen years. *Id.* Communications regarding the proposed lease term sheet occurred over the ensuing months between CBRE, Great Oaks, Chad, and the parties' separate outside counsel. PSMF at ¶ 13.

On April 25, 2019, Great Oaks requested a change in the proposed lease term from fifteen years to five years. PSMF at ¶ 14. Mr. Dolan at CBRE responded, indicating this was "not what we agreed to and we will not be able to accept this particularly given the amount of capital Chad is committing upfront." PSMF at ¶ 14, MSJ at Ex. 14, CBRE_000498–99. Great Oaks responded indicating that the new proposed lease term would allow for automatic renewal at five-year intervals so long as Great Oaks' school charter remained in effect. *Id.* Mr. Dolan emailed Chad and Chad's outside counsel explaining that the "explanation and this contingency seem[] to make sense" but noted that the parties should "discuss if we need further clarification." *Id.*

On April 29, 2019, Mr. Dolan reached out to Chad's outside counsel with a proposed fifteen-year lease term subject to "early termination" language, "as opposed to having the (3) 5 year automatically renewing terms." PSMF at ¶ 14; MSJ at Ex. 14, CBRE_000497. On May 14, 2019, Chad's outside counsel reached out to Mr. Dolan at CBRE to clarify the lease term. *Id.* at CBRE_000557. Mr. Dolan reiterated that CBRE's proposed term was 15 years and Chad's outside counsel responded that it would "finalize the revision accordingly." *Id.* at CBRE_000563.

On May 30, 2019, Chad's outside counsel emailed CBRE and Chad and informed the parties that, under their research of charter school law, Great Oaks required a right to terminate the

4

lease in the event their charter was revoked. PSMF at ¶ 18; MSJ at Ex. 14, CBRE_000747. On May 31, 2019, Chad's outside counsel revised the proposed fifteen-year lease to insert the "early termination concept tied to a revocation of the school's charter in order to be consistent with law." PSMF at ¶ 19; MSJ at Ex. 14, CBRE_000855.

Chad and Great Oaks executed the proposed lease of the Subject Building on June 25, 2019. PSMF at ¶ 20; MSJ at Ex. 14, CBRE_001342–88 (the "June 25, 2019 Lease Agreement"). The executed June 25, 2019 Lease Agreement contained a fifteen-year term with an early termination provision. *See* June 25, 2019 Lease Agreement at ¶¶ 2.1, 2.2.

Pursuant to the Commission Agreement, CBRE generated an invoice addressed to Chad dated July 25, 2019, in the amount of $107,665.85. PSMF at ¶ 22; CBRE_001428, 1441–42. CBRE asserts that this was approximately 25% of what it believes is the full commission due - $430,663.37. *Id.*[1] The same day, Mr. Stevenson at Chad emailed Mr. Dolan at CBRE thanking him for his successful representation in securing a tenant for the Subject Building and informing CBRE that it would be amending the lease term from fifteen years to reflect successive five-year terms with renewals in order "to properly comply with statutes applicable to charter schools under New Jersey law." PSMF at ¶ 23. Chad and Great Oaks entered into an amended lease dated October 3, 2019 (the "October 3, 2019 Lease Amendment). *See* Counterstatement of Material Disputed Facts on Behalf of Defendant ("DCSMF") at ¶ 30. Thereafter, the parties disputed what, if any, payments were due from Chad to CBRE under the Commission Agreement.

Chad contends that the amount of commission due in the July 25, 2019 invoice was inconsistent with the Commission Agreement read in tandem with the October 3, 2019 Lease

---

[1] The July 25, 2019 invoice calculates that Chad would receive $10,766.584.20 from Great Oaks in monthly rent payments during the fifteen-year lease term. At 4% commission, as provided for in the Commission Agreement, the "total commission" owed from Chad to CBRE under this transaction is $430,663.37. PSMF at ¶ 22; CBRE_001428, 1441–42

Amendment. The amended lease term was to commence on July 1, 2020 and run for one year through June 30, 2021. DCSMF ¶ 30; ECF No. 49–6 at Section 2.1. The amended lease term also provided for automatic extensions beyond the initial one-year lease contingent upon Great Oaks' charter school licensure:

> [S]o long as Tenant's Charter is in effect, the term hereof shall be automatically extended for the following periods (each, an "Extension Period"): (a) an additional period of five(5) years from July 1, 2021 until the earlier of June 30, 2026 or the Closure Date [resulting from loss of charter school license], (b) an additional period of five (5) years from July 1, 2026 until the earlier of June 30, 2031 or the Closure Date, and (c) an additional period of four (4) years from July 1, 2031 until the earlier of June 30, 2035 or the Closure Date.

*Id*. Therefore, Chad contends that issues of material fact remain as to whether it breached its payment obligation with CBRE. *See* Defendant's Response to Statement of Material Facts of Plaintiff ("DRSMF") at ¶ 22; CBRE_000982. In other words, Defendant disputes the existence and relevancy of any amounts due to Plaintiff under the original June 25, 2019 Lease Agreement given the October 3, 2019 Lease Amendment's revised term, which Defendant argues starts with a one-year term, and mandates commission payments only upon the initial term and subsequent *renewal* of successive terms. *See generally* Opp.

CBRE avers that, notwithstanding Chad and Great Oaks' decision to purportedly amend the underlying lease, there is no genuine dispute that Chad owed money to CBRE under the Commission Agreement immediately upon the execution of the original June 25, 2019 Lease Agreement. Further, CBRE argues that regardless of which lease is operative for determining commission payments moving forward, it is undisputed that Chad declined to make *any* initial payment to CBRE, therefore breaching the Commission Agreement and triggering the acceleration clause. As of the date of Plaintiff's MSJ, Chad has failed to remit any commission payments to CBRE. PSMF at ¶ 51; MSJ at Ex. 8, Deposition of Eric Stevenson dated June 21, 2021

6

("Stevenson Tr.") at 84:22–85:13 ("Q: At any point in June of 2019 did you approve payment of commissions to CBRE? A: No. Q: At any point in July of 2019 did you approve commissions payable to CBRE? A: I received an invoice from CBRE in July of 2019 that I did not pay. Q: At any point in July of 2019 did you approve of payment[?] A: No . . . . Q: At any time after July of 2019 up to today have you ever approved payment of commissions to CBRE? A: No.").

## II.  PROCEDURAL HISTORY

Plaintiff initiated this action on July 16, 2020. ECF No. 1. Plaintiff brings a one-count complaint for breach of contract, seeking $430,663.37 in alleged unpaid commissions under the Commission Agreement. *Id.* Additionally, pursuant to the same Commission Agreement, Plaintiff seeks collection costs incurred, including reasonable attorneys fees and disbursements, plus interest on all of the above requested awards. *Id.* Defendant answered on October 9, 2020. ECF No. 13.

The parties initiated discovery via the Court's initial discovery order on November 4, 2020. ECF No. 16. On June 23, 2021, Defendant deposed Conor Dolan, CBRE's corporate representative and lead broker on the subject transaction. MSJ at Ex. 7 ("Dolan Tr."). The next day, on June 24, 2021, Plaintiff deposed Eric Stevenson, Chad's corporate representative and Executive Director. *See* Stevenson Tr. On October 8, 2021, Plaintiff produced the expert report of Michael Seeve. MSJ at Ex. 9, CBRE_000251 ("Seeve Report"). On January 24, 2022, Defendant indicated to the Court that it did not need an expert report in this matter and thus did not serve one. ECF No. 38. On March 15 and April 4, 2022, Defendant deposed Mr. Seeve. MSJ at Ex. 9, CBRE_000001–250.

On April 29, 2022, Plaintiff moved for summary judgment on its one-count action for breach of contract. ECF No. 46. Defendant opposed (Opp.) and Plaintiff replied (Reply). The Court now decides Plaintiff's motion for summary judgment.

### III. LEGAL STANDARD

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *see also Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986); Fed. R. Civ. P. 56(c).

The moving party has the initial burden of proving the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-moving party has the burden of identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To meet its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (stating that "[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact . . . [the opponent must] exceed[] the 'mere scintilla' threshold.").

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 248. A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's

8

evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

## IV. DISCUSSION

Under New Jersey law, a breach of contract claim requires the plaintiff to show that "the parties entered into a valid contract, that the defendant failed to perform [its] obligations under the contract and that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007). "Parties to a contract must 'agree on essential terms and manifest an intention to be bound by those terms.'" *Shogen v. Glob. Aggressive Growth Fund, Ltd.*, No. 04-5695, 2007 WL 2264978, at *3 (D.N.J. Aug. 3, 2007) (quoting *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992)).

For the reasons set forth the below, the Court will grant summary judgment in favor of Plaintiff as to liability. The Court finds that there is no genuine dispute of fact with regard to Defendant's liability for breach of contract.

### A) There is no genuine dispute that the parties entered into a valid contract.

Defendant has not sufficiently contested that the parties entered into a valid and enforceable Commission Agreement governing their relationship with respect to leasing the Subject Building. Under New Jersey law, an enforceable contract is created when two parties "agree on essential terms and manifest an intention to be bound by those terms[.]" *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992). The parties agree that on or about October 6, 2017, CBRE and Chad entered into an exclusive brokerage commissions agreement. PSMF at ¶ 7; DCSMF at ¶¶ 1–5; MSJ at Ex. 14, Commission Agreement at ¶ 2. The parties also agree that on or about September 17, 2018, Chad and CBRE mutually agreed to amend the Commission Agreement to accommodate an updated payment schedule. PSMF at ¶ 9; DCSMF at ¶ 6–7; MSJ at Ex. 14, CBRE-000166. Accordingly, the Court proceeds to the next stage of its breach of contract analysis.

### B) There is no genuine dispute that Defendant failed to perform its obligations under the contract.

Plaintiff asserts that Defendant indisputably breached the Commission Agreement when it failed to remit *any* payment to Plaintiff upon Chad's execution and delivery of the June 25, 2019 Lease Agreement with Great Oaks. MSJ at 7–9. Defendant contends that triable facts remain, specifically regarding the applicable lease term and when payment obligations were triggered under the Commission Agreement. Opp. at 19–30.

Plaintiff has put forth evidence showing an absence of a factual dispute as to Defendant's breach. Under Paragraph 7 of the Commission Agreement as amended on September 17, 2018, "twenty-five percent (25)" of Plaintiff's 4% commission comes due "upon full execution and unconditional delivery of the binding transactional documents." Commission Agreement at ¶ 7. There is no dispute that the June 25, 2019 Lease Agreement (here, the binding transactional document contemplated by the Commission Agreement) between Chad and Great Oaks was executed and delivered to CBRE on June 25, 2019. PSMF at ¶ 20. Thus, under a plain reading of Paragraph 7 to the agreement, 25% of Plaintiff's 4% commission came due on June 25, 2019. Yet, Defendant acknowledges it has not made *any* commission payments to Plaintiff under the Commission Agreement. *Id.* at 84:22–85:13 (Mr. Stevenson testifying that he was responsible for approving payment of commissions for Chad, and that at no point did he approve commission payments to CBRE for its services rendered). Defendant has not put forth sufficient evidence to genuinely dispute that it breached its payment obligation to Plaintiff. Rather, Defendant has acknowledged that it owes payment to Plaintiff for services rendered under the Commission Agreement. *See* Stevenson Tr. at 47:7–14 ("Q: As you sit here today, does the Chad school believe that it owes CBRE a commission? A: Yes  Q: And is that commission based on the services that

CBRE provided to the Chad school? A: Yes.").[2] It is undisputed in the record that payment under the Commission Agreement became due to CBRE regardless of whether the June 25, 2019 Lease Agreement or the October 3, 2019 Lease Amendment governed the amount. Yet any and all commissions remain unpaid. Accordingly, there is no genuine dispute that Defendant breached its obligation to remit payment to Plaintiff under the Commission Agreement.

As discussed above, the Commission Agreement calls for payment to CBRE upon execution and delivery of the "binding transactional documents," (PSMF at ¶ 7) – here, the underlying June 25, 2019 lease. Insofar as Defendant argues that "binding transaction documents" is an ambiguous term that precludes summary judgment, the Court is not persuaded, nor is such an inquiry relevant under this record. Opp. at 20–21, 27. Under New Jersey law, "[w]here the terms of a contract are clear and unambiguous, there is no room for interpretation or construction and the courts must enforce those terms as written." *Karl's Sales & Service, Inc. v. Gimbel Brothers, Inc.*, 249 N.J. Super. 487, 592 (App. Div.1991) (citations omitted). Whether a contract's provisions are clear and ambiguous is a question of law appropriate for summary judgment. *See J.I. Hass Co., Inc. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3d Cir. 1989), *cert denied* 493 U.S. 1080 (1990) (noting that where contract is unambiguous, determination of parties' intent is a question

---

[2] From August 2019 through June 2020, the parties discussed potential solutions to the commission dispute. PSMF ¶¶ 25–43. One such exchange, dated September 24, 2019, included Mr. Stevenson's suggestion that, given the proposed amendment to the lease term, Chad now owed CBRE $24,444.80 in "commission for the initial rent period" with "$6,111.20 due immediately to CBRE now that the lease amendment has been executed." PSMF at ¶ 27; MSJ at Ex. 14, CBRE_0001553. At his deposition, Mr. Stevenson testified that even after executing the amended lease, Chad incurred payments due immediately to CBRE. Stevenson Tr. at 153:6–24 (Stevenson: "The $6,111.20 was due immediately because Great Oaks was required to pay three months worth of rent at approximately $50,926 in advance. So that's $6,111.20 is based on the advanced rent."); *see also id.* at 153:25 – 154:13 (Q: So the difference between the $24,444.80 and the $6,111.20 is $18,333.60. . . . When was that sum the [$18,333.60] or the balance due according to your calculations? A: They would have both been due immediately. Q: So the whole sum of the $24,444.80[sic], correct? A: Yes.").

of law). Here, evidence in the record has removed any dispute that "binding transactional documents" unambiguously refers to the June 25, 2019 Lease Agreement between Chad and Great Oaks. At the time the June 25, 2019 lease was executed and delivered, there is no genuine dispute that it was the binding transactional document contemplated in the Commission Agreement, and the result of a fully negotiated transaction from all parties involved. Moreover, not only has Defendant failed to come forth with a valid explanation of why this term may be ambiguous, but CBRE's expert defined "binding transactional document" as the June 25, 2019 Lease Agreement based on his 29 years of experience. DCSMF at ¶ 109. Defendant has not put forth an expert, nor has it demonstrated the existence of sufficient evidence to establish a genuine dispute of material fact on this issue. Accordingly, upon execution and delivery of the unambiguous June 25, 2019 Lease Agreement, Defendant's payment obligation to CBRE triggered under the Commission Agreement.

Even if the Court were to adopt Defendant's proposed definition of binding transaction documents, which they contend may refer to the October 3, 2019 Lease Amendment (Opp. at 20–26), Defendant still has not demonstrated a genuine issue of material fact as to breach. As noted above, even if the Lease Amendment were to in some way alter the terms of the Commission Agreement, Defendant's corporate representative acknowledged that Chad still owed an initial commission payment to CBRE and that Chad did not and will not make that payment. *See Advanced Drainage Sys., Inc. v. Siteco Materials, Inc.*, No. 13-1349, 2014 WL 5512886, at *5 (D.N.J. Oct. 31, 2014) (granting summary judgment on breach of contract where defendant admitted in discovery that it refused to make payment for services rendered). Defendant's arguments cannot evade the undisputed fact that it did not make *any* payment due under the Commission Agreement. *Id.* at *6 ("Merely disputing the amount of damages in question is not sufficient to create a genuine dispute of material fact for trial as to the issue of [defendant's]

12

liability."). As Plaintiff explains, "the sum or timing of the payments is wholly separate from the question of liability . . . . The sum or timing each make for a damage calculation, not a genuine issue of material fact on liability." Reply at 8. Therefore, the Court finds that no genuine issue of material fact exists as to Defendant's breach of the Commission Agreement.

### C) There is no genuine dispute that Plaintiff suffered damages as a result of Defendant's breach.

Under the final prong of the breach of contract analysis, Plaintiff has sufficiently demonstrated that it suffered damages as a result of Defendant's breach, and has therefore established that no genuine dispute of material fact exists as to Defendant's liability for breach of contract on summary judgment. Plaintiff has adequately shown that it performed its obligation under the Commission Agreement upon Chad and Great Oaks' execution of the June 25, 2019 Lease Agreement. PSMF at ¶ 51; Stevenson Tr. at 84:22–85:13, 175:3–11. Further, Plaintiff has shown that it was entitled to compensation for performing such services under the Commission Agreement. *Id.*; *see also* Commission Agreement at ¶¶ 2, 5, 7. To this date, Plaintiffs has been paid nothing for performing its obligation under the Commission Agreement. Accordingly, undisputed evidence demonstrates that Plaintiff suffered damages, and moreover, that Plaintiff has established a valid claim for breach of contract.

### V.     CONCLUSION

Accordingly, for the foregoing reasons, Plaintiff is entitled to summary judgment on liability for its breach of contract claim and this Court will refer the matter back to mediation for resolution on damages consistent with the analysis herein. An appropriate Order accompanies this opinion.

**DATED:** December 20, 2023

*s/Claire C. Cecchi*
**CLAIRE C. CECCHI, U.S.D.J.**